**DAVIS AIRFOILS, Inc. v. UNITED STATES.**

No. 48775.

United States Court of Claims.

March 3, 1953.

Edward Gallagher, Washington, D. C., for plaintiff.

H. L. Godfrey, Washington, D. C., Holmes Baldridge, Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

LITTLETON, Judge.

The plaintiff is the owner of certain United States Letters Patent, hereinafter referred to, issued on certain alleged inventions and improvements relating to the cross-sectional profile designs of airplane wings in front to rear section, currently known and referred to in the record as the "Davis Wing." As hereinafter more fully set forth, the plaintiff and the defendant through The Royalty Adjustment Board at Wright Field entered into an agreement, commonly called a royalty adjustment agreement, whereby the defendant was granted a nonexclusive right and license, for the consideration and under the terms mentioned in said agreement to use plaintiff's inventions. By an amended petition filed herein December 13, 1950, the

plaintiff sues the defendant for alleged breach of said agreement.

The basis of plaintiff's claim that the defendant has breached the agreement, and of its claim for damages for such alleged breach, is set forth in paragraph XIII of its petition as follows:

"To the extent that petitioner's invention was embodied in airplanes caused to be manufactured by defendant and used throughout the world by governments, and parties, other than the United States Government, and to the extent that airplanes embodying petitioner's inventions have been disposed of by defendant for other than governmental purposes, petitioner has been damaged by the difference between a fair and reasonable royalty, namely, the sum of eight hundred dollars ($800.00) per airplane, and the reduced royalty set forth in the agreement of five dollars ($5.00) per airplane."

The case was heard by Commissioner Gordon, at which hearing the defendant claimed that it had not breached the agreement and interposed the further defense, under paragraph thirteen of the agreement entitled "Reservation of Rights," that the claims and the patents in suit were invalid. Upon plaintiff's objection that the defendant as a licensee could not question the validity of the patents under the license agreement, the Commissioner ruled, in view of paragraph thirteen (hereinafter set forth), that defendant should be allowed to submit evidence as to the validity of the patents in question.

The Commissioner has filed his report of the facts relating to the making of the agreement of June 29, 1943, and the terms and conditions thereof together with findings of fact relating to the patents, the manufacture, use, and disposition by defendant of airplanes embodying plaintiff's alleged inventions and the validity of the claims and the patents covered by said agreement of June 29, 1943.

The Commissioner found, with respect to the first patent No. 1,942,688, issued January 9, 1934, that claims 1 to 12, inclusive, thereof were invalid. As to claim 13, the Commissioner found that "There is no satisfactory evidence that claim 13, which specifically limits the value of $B$ to 18% to 33% of the value of $A$, is directed to an inoperative structure or is invalid." As to the second patent No. 2,281,272, issued April 28, 1942, the Commissioner found that this patent "extends the monopoly already covered by the claims of the first patent for a period of more than 17 years, and the second Davis patent is void because of doubling patenting."

Within 30 days after the filing by the Commissioner of his report, the defendant filed with the court its motion asking that the court refer the case to Commissioner Gordon, for the taking of further evidence newly discovered as to the validity of claim 13 and the patent No. 1,942,688.

The facts found and reported by the Commissioner in his report of April 28, 1952, insofar as material to the question before the court on defendant's motion, are set forth below in paragraphs numbered 1 to 22, inclusive:

1. Davis Airfoils, Inc., is a corporation organized and existing under the laws of the State of California, with its principal offices at 334½ North Sycamore Street, Los Angeles, California.

2. Plaintiff is the licensee of certain patents relating to the cross-sectional profile designs of airplane wings in front to rear section (currently known and referred to as the "Davis Wing"), for which United States Letters Patent No. 1,942,688 were issued January 9, 1934, and No. 2,281,272 on April 28, 1942. Copies of these patents are in evidence as defendant's exhibits 10 and 11 respectively.

3. On June 29, 1943, plaintiff entered into a license agreement with defendant, identified as "Contract W–535 ac–40218 (10569)," and effective on April 1, 1943. This contract is hereinafter referred to as the contract in suit.

A true copy of this contract is appended to the petition as Appendix A, except that pursuant to a stipulation filed by the parties, the last sentence of paragraph "First" of the contract should be amended

by removing the parentheses and by making plural the word "airplane."

The corrected sentence then reads:

"Licensor agrees not to make any claim other than as provided herein against Government by virtue of any delivery, sale or other disposition of airplanes upon which a royalty has been paid to Licensor."

The contract in suit specifically states that it "shall continue in effect until the end of the present National Emergency and for six (6) months thereafter." The contract was in full force and effect when the transactions involved in this case occurred.

The plaintiff alleges breach of the terms of this contract by the unauthorized disposal by the Government of certain airplanes.

4. Prior to the effective date of the aforesaid contract in suit and on or about February 9, 1938, the plaintiff had entered into a license agreement with Consolidated Aircraft Corporation providing for the payment to plaintiff of a royalty for the use of the Davis airfoil or wing. This royalty was based on a sliding scale, beginning at ½ of 1% of the selling price of the airplane less engines, propellers and usual Government-furnished materials, and decreasing to a minimum of $\frac{1}{16}$ of 1% of such selling price. This license agreement was in part as follows:

"In the event that this Corporation uses the Davis airfoils on any experimental airplane, we agree to pay Mr. Davis $2,500.00 for each first prototype employing same. For subsequent airplanes of the same model, we agree to pay royalties based upon the selling price of the airplanes (not including spares), less engines, propellers and the usual Government furnished material, according to the following table as full compensation for the use of said airfoils:

|  | Percent |
|---|---|
| 0 to $1,000,000 | ½ |
| $1,000,000 to $5,000,000 | ⅜ |
| $5,000,000 to $10,000,000 | ¼ |
| $10,000,000 and upwards | ⅛ |

When the total of royalties paid aggregates $50,000 the above scale of royalties will be reduced 50%. Said payments of royalties to be made quarterly from date of first use, within ten (10) days after the end of each quarter, and to cover all airplanes equipped with Davis Airfoil Sections produced in the said quarterly period, such royalty payments to be accompanied by a statement showing the number, type, and selling price of aircraft upon which the airfoil has been used."

This license agreement, plaintiff's exhibit 9, is made a part of this finding by reference.

5. Royalties in substantial amounts were paid under this license agreement, at the rates provided in the sliding scale, on 166 airplanes purchased by Great Britain directly from Consolidated in 1941 and prior thereto, and also on aircraft subsequently purchased for the United States Government. These royalties were paid over a period beginning in 1939 and extending to the effective date of the contract in suit (April 1, 1943). There is no evidence of any direct purchases of airplanes by Great Britain from Consolidated subsequent to 1941.

At the time of completion of the British contracts in 1941 the royalty rate being paid upon the airplanes sold directly to Great Britian was $\frac{1}{16}$ of 1% of the net cost, with certain deductions.

At the time the contract in suit became effective the royalty rate on the B–24 airplanes paid by Consolidated was $\frac{1}{16}$ of 1% or $92.71 per plane at the then selling price of the planes (plaintiff's exhibit 29).

6. The negotiations that ultimately led up to the contract in suit were initiated by a letter dated April 2, 1943, from The Royalty Adjustment Board at Wright Field to the plaintiff. This letter read as follows:

"1. The matter of your license agreement with the Consolidated Aircraft Corporation has been referred to The Royalty Adjustment Board for

consideration under Public Law 768, 77th Congress, 2nd Session.

"2. Before proceeding further in the matter, the Board is desirous of obtaining relevant facts pertaining to the agreement, the patent and patent applications involved, and the royalties paid and to be paid thereunder. It will be appreciated if you will indicate the earliest convenient date when an informed representative of your corporation will confer with the Board at this office."

Pursuant to this letter, the plaintiff, represented by David R. Davis, and its counsel, Oscar A. Trippet, conferred at Wright Field with Capt. Walter R. Bruington, executive officer of The Royalty Adjustment Board.

Initially the discussions concerned a reduction under the Royalty Adjustment Act of 1942, 35 U.S.C.A. § 89 et seq., in the amount of the royalty set forth in the Consolidated Aircraft Corporation contract. Subsequent to the initial discussions there was also some discussion of a settlement for alleged past infringement by Government contractors. The discussions, however, later turned to the negotiation of a license contract between the plaintiff and the Government, which contract, when executed, became the contract in suit.

In connection with this phase of the matter, a Major Bowes of the Procurement Division, which had contractual authority, entered into the picture as the responsible officer at Wright Field in charge of the negotiations and the final approval of the contract. Captain Bruington still assisted in an advisory capacity.

7. The present controversy centers about paragraphs 1, 2 and 13 of the contract in suit. The negotiations leading ultimately to paragraphs 1 and 2 are set forth below, and paragraph 13 is subsequently referred to in findings 20 to 22.

Early in the negotiations a royalty rate of $5 per airplane was agreed upon. In this connection, and as expressed in the second "Whereas" clause of the contract, the plaintiff was desirous of making available the wider use of airplane wings embodying the use of its inventions and—

"to have additional sources of supply for same, in the interest of facilitating the prosecution of Government's effort in the present National Emergency."

In connection with the reduction of the royalty rate it was plaintiff's objective, as expressed throughout the negotiations, not to have the airplanes thus acquired by the Government disposed of in such a way as to interfere with its postwar commercial interests in this country or its foreign markets.

On the contrary, it was the expressed objective of the Government's representatives that upon the payment of a royalty on an airplane the plaintiff could not make a further claim against the Government by virtue of any delivery, sale or other disposition of that particular airplane.

8. In the preparation of the preliminary drafts of paragraphs 1 and 2 of the contract in suit, paragraph 1 of a previous license agreement known as the Fowler contract and also relating to airplane parts (plaintiff's exhibit 17) was used as a guide. Paragraph 1 of the Fowler agreement reads as follows:

"1. The Licensor hereby grants to the Government an irrevocable, nonexclusive right and license under each of the claims of the patents hereinbefore in the preamble of this license agreement enumerated, and/or referred to, and under all other patents and/or applications for patents and/or present and future inventions or improvements whether patented or unpatented relating to the Commodity herein defined and/or to the manufacture thereof which now or hereafter may be owned or controlled by Licensor, or under which Licensor may have any right to grant licenses, during the term hereinafter defined, to manufacture, use, sell, and/or otherwise dispose of the Commodity *including disposition to lend-lease countries under the act of March 11, 1941, as amended,* and/or cause the Commodity to be manufactured, used,

sold and/or otherwise disposed of throughout the world, and to employ or have employed, in any manner deemed necessary or expedient for the foregoing purposes, any designs, specifications, drawings, or other information, relating to the Commodity, supplied by Licensor to the Government or to nominees or representatives thereof. It is understood that the license herein granted is limited to the manufacture, use, sale or other disposition of the Commodity, or information relating thereto, *by or for the Government for Governmental purposes.* [Italics supplied.]"

9. The first working draft comprised two sheets containing the "Whereas" clauses and certain other matter (defendant's exhibit 1) and a single sheet containing a tentative draft of paragraphs 1 and 2 of the contract (plaintiff's exhibit 18).

The first paragraph of this draft departed from the language of the Fowler contract by eliminating reference to lend-lease business and by eliminating language that would authorize the Government to sell or otherwise dispose of aircraft employing the Davis wing throughout the world.

The second paragraph of this draft differed from the Fowler contract by changing the wording from "Governmental purposes" to "military purposes" and added a clause stating that the Government might at any time and from time to time dispose of aircraft manufactured under the license without restriction.

10. In the next working draft (plaintiff's exhibit 19) paragraph 1 was changed in the opening clause, which refers to licensor granting to the Government a nonexclusive right and license, by adding after the word license, "as hereinafter limited," and by the inclusion of the following language at the end of paragraph 1:

"The right to manufacture and sell herein granted may be exercised only in the United States. The right to use, however, shall extend to all parts of the world."

In this working draft the language of paragraph 2 relating to the use of the li-

censed airplanes by the Government was changed from "military purposes" to "its Governmental purposes."

11. At a subsequent conference at which Captain Bruington, Mr. Trippet and Major Bowes were present, the next draft, and what was, in many respects, the last draft, of the entire contract was completed (plaintiff's exhibit 20). At this conference the provisions of Section 2 were the subject of further discussion and it was agreed that the terms of this section could be further clarified so as to more simply express the intent of the parties. These changes were incorporated in a subsequent mimeographed copy of the contract and were carried into the final draft as it was executed by the parties.

Following this conference Mr. Davis and Mr. Trippet returned to Los Angeles, Mr. Trippet carrying with him a retyped copy of plaintiff's exhibit 20, such retyped copy being identified as plaintiff's exhibit 30. Paragraphs 1 and 2 of plaintiff's exhibits 20 and 30 read as follows:

"1. Licensor hereby grants to Government, commencing as of April 1, 1943, a nonexclusive right and license as hereinafter limited, under each of the said patents and under all other patents or applications for patents or present and future inventions or improvements, whether patented or unpatented, relating to the airplane wings herein defined, which now or hereafter may be owned or controlled by Licensor, or under which Licensor may have any right to grant licenses during the term hereinafter defined, to manufacture and sell or otherwise dispose of or cause to be manufactured and sold or otherwise disposed of throughout the United States and its territories, and to use throughout the world, airplane wings which embody said inventions. Licensor agrees not to make any claim against Government by virtue of any delivery, sale or other disposition of airplanes upon which a royalty was paid under the terms of this Agreement.

"2. The License described in Paragraph First hereof is limited to the manufacture, use, sale or other disposition of airplane wings which embody said inventions, to or for, directly or indirectly, Government for its Governmental purposes during the continuance of the present National Emergency and for six months after the termination thereof; provided, however, that any bona fide contracts let for the manufacture of airplane wings which embody said inventions, and which are not completed prior to the termination hereof, may be completed; and provided further, that at any time and from time to time after the termination hereof, the Government may, without restriction, use, sell or otherwise dispose of, or cause to be used, sold or otherwise disposed of, any of the airplanes manufactured under this License.

"The term 'present National Emergency' as used herein shall be deemed to mean the present National Emergency declared by the Congress of the United States or by Presidential Proclamation (and whether or not involving war) as from time to time continuing or extended."

12. Following the return of Mr. Davis and Mr. Trippet to Los Angeles, plaintiff received a letter dated June 3, 1943, bearing the initials of Major Bowes and enclosing three mimeographed copies of the purported contract, with the request that it be duly executed and returned. There were, however, certain changes in the mimeographed copy which differed from the final draft considered by the parties at Wright Field. These changes involved paragraphs 1 and 2 and also paragraph 4, and gave rise to a subsequent chain of correspondence between Mr. Trippet and Major Bowes, of the Procurement Section at Wright Field. For convenience, these paragraphs of the mimeographed contract are set forth below:

"First

"Licensor hereby grants to Government, commencing as of April 1, 1943, a nonexclusive right and license as hereinafter limited, under each and all of the claims of the said Patents No. 1,942,688 and No. 2,281,272 and under all other patents, applications for patents, and present and future inventions or improvements, whether patented or unpatented, relating to airplane wings which now or hereafter may be owned or controlled by Licensor, or under which Licensor may have any right to grant licenses during the term hereinafter defined (all hereinafter sometimes collectively referred to as 'the inventions'), to manufacture and sell or otherwise dispose of or cause to be manufactured and sold or otherwise disposed of throughout the United States and its territories, and to use throughout the world, airplane wings which embody said inventions. Licensor agrees not to make any claim against Government by virtue of any delivery, sale or other disposition of airplanes upon which a royalty has been paid to Licensor.

"Second

"The rights and license herein granted and conveyed shall be for Governmental purposes only and shall continue in effect until the end of the present National Emergency and for six (6) months thereafter, except that contracts entered into before the end of such period may be completed and all of the airplane wings which embody such inventions on hand at the end of said period, or completed as permitted herein, may be used, sold and/or disposed of without restriction.

"The term 'present National Emergency' as used herein shall be deemed to mean the present National Emergency declared by the Congress of the United States or by Presidential Proclamation (and whether or not involving war) as from time to time continuing and/or extended.

"Fourth

"Licensor hereby agrees to grant, during and for the life of this Agreement, to such manufacturers as may be designated by Government, nonex-

clusive licenses to manufacture, use and sell airplane wings, embodying the inventions hereby licensed, at a royalty not to exceed Five Dollars and No Cents ($5.00) per airplane."

13. Upon receipt of the mimeographed contract referred to in the previous finding and under date of June 7, 1943, Mr. Trippet wrote to the Procurement Section at Wright Field, which letter is quoted in part below (plaintiff's exhibit 23):

"Your letter of June 3rd has just been received.

"The changes made from the draft of the Agreement agreed upon while I was in Wright Field are all satisfactory, and in most instances improve upon the earlier draft, except two. I should like to have the words 'under the terms of this Agreement,' added at the end of Paragraph First on Page Two. If these words are omitted from the Agreement, airplanes could be manufactured and a royalty paid in any amount, say, $1.00 per airplane or they could be used for purposes other than Governmental purposes and we would have no claim on account thereof. This does not seem to be fair and I am sure you will not object to adding the wording suggested.

"The other change which I would like to have made is in Paragraph Fourth. After the word 'for' in line one, add 'a period of time coextensive with,' and after the word 'sell' in the third line add 'for Governmental purposes only.' These amendments should not be objectionable to you, and confine our obligation to grant licenses to the principal terms and conditions of our license to the Government.

"If you concur with these amendments, it will necessitate the rewriting of Page Two, and as such rewriting is necessary, may I respectfully suggest that we omit the 'and/or' appearing in the next to the last line of the first paragraph of Article Second, and the last line of that Article. They do not appear at any other place in the Agreement.

"If you concur in making these changes and will cause Page Two to be rewritten and mimeographed and forward me a set, I will cause the Agreement to be executed immediately and returned to you.

"While I am waiting to hear from you, I have requested Consolidated to execute an Agreement between the Consolidated and Davis Airfoils so that we will be in a position to execute the contract with the Government immediately. * * *"

14. In a letter dated June 11, 1943, bearing the initials of Maj. T. F. Bowes, the Procurement Section at Wright Field wrote plaintiff in part as follows (plaintiff's exhibit 24) and enclosed a redraft of page 2 (defendant's exhibit 2): [1]

"1. This will acknowledge receipt of your letter of June 7, 1943, requesting certain changes be made in the subject contract.

"2. The request contained in the second paragraph of your letter to the effect that the words 'under the terms of this Agreement,' be added at the end of paragraph First on page 2 is not acceptable to the Government. It is the understanding of this office that if Davis Airfoils, Inc., receives a royalty payment by virtue of any delivery, sale or other disposition of airplanes no further claim will be made against the Government. The purpose of the inclusion of the language in question was to avoid the creation of any problem with reference to Lend-Lease or a similar problem. Further, it is apparent that no payment made to Davis Airfoils, Inc., which does not conform to an Agreement to which your company is a party would be within the legal definition of the term 'royalty payment.'

"3. The request that the words 'for Governmental purposes only' be added after the word 'sell' in the third line

---

1. The handwriting on the right-hand margin of this exhibit was added by Mr. Trippet after receipt of defendant's exhibit 2.

is not acceptable to the Government for the reason that again it may create a problem with reference to Lend-Lease airplanes.

"4. The remaining changes suggested in your letter are agreeable and have been made.

"5. Herewith are ten (10) copies of Page 2 which will reflect the changes which are agreeable to the Government. It is requested that you substitute these pages in the copies now in your possession and return to the Government forthwith three (3) signed numbers of the contract. * * *"

15. Mr. Trippet on June 18, 1943, replied in part as follows (plaintiff's exhibit 25):

"* * * I am sorry that I am not yet in a position to advise my client to execute the agreement in its present form.

"I am not particular as to just what language is used in the two places referred to in my letter of June 7th and referred to in Paragraphs 2 and 3 of your letter of June 11th. I will appreciate, however, your working out or suggesting some language that will be satisfactory to you and will, at the same time, meet my objections. Your Major Bowes with whom I worked on the final draft of the agreement before I left Wright Field will recall our discussion in connection with these two points.

"The draft of the agreement agreed upon before I left Wright Field contained the words at the end of Article first on Page 2 which I requested to be included in the mimeographed copy. Not anticipating that the words would be eliminated, I was unable before leaving Wright Field to explain all of my reasons for wanting them included. In my letter of June 7th I pointed out what I thought would be a reasonable interpretation of the last sentence of Article first by giving two illustrations of situations which I felt might foreclose us from making a claim against the Government, when as a matter of fact terms of the agreement had not been lived up to.

"In Paragraph 2 of your letter of the eleventh, you say, 'It is the understanding of this office that if Davis Airfoils, Inc., receives a royalty payment by virtue of any delivery, sale or other disposition of airplanes no further claim will be made against the Government.' Such, of course, is not our understanding, nor could it have been the understanding at the time we completed the final draft of the agreement before I left Wright Field as the language which I now wish included in Article first was included at that time. Neither do I see how such an understanding could be in your mind when you read the opening clause of Article second of the agreement in its present mimeographed form. That clause reads, 'The rights and license herein granted and conveyed shall be for Governmental purposes only * * *.'

"Thus, it is clear that our understanding could not have been that we have no claim for a royalty paid by virtue of 'any delivery.' May I respectfully suggest that I do not believe that the licensor can be called upon to waive a claim except for royalty payments made in accordance with the terms of the agreement.

"If the particular language which was contained in the form of the final draft of the agreement at the time I left Wright Field is objectionable, as it now seems to be, may I suggest that perhaps it would not be objectionable to say licensor agrees not to make any claim against Government by virtue of any delivery, sale, or disposition of airplanes upon which a royalty has been paid, in accordance herewith, to licensor.'

"You stated in the last sentence of Paragraph 2 of your letter of June 11th that no payment made to Davis which did not conform with the agreement would be within the legal definition of the term 'royalty payment' as used in

Article first. I believe the sentence just suggested probably clarifies this thought. As above indicated, any clarification of the sentence in question will be satisfactory with me provided it is clear that the broad statement made by you as to your understanding in the second sentence of Paragraph 2 of your letter of June 11th is not true. In other words, I feel that it is necessary that there be some limitation so that the agreement will not imply that the understanding is as you indicated it was.

"I next asked you in my letter of June 7th to amend Article fourth in two particulars. You will recall that in the final draft of the agreement as prepared when I left Washington, Article fourth read 'licensor agrees to grant at the instruction of Government to such manufacturers as may be designated by Government, nonexclusive licenses to manufacture, use and sell airplane wings embodying the inventions hereby licensed, upon the same terms, conditions and limitations as those contained in this license * * *.'

"Article fourth, as rewritten by you, in the mimeographed agreement would have required the licensor to grant licenses upon terms that were not defined except as to the amount of the royalty. I requested you to incorporate in Article fourth the two other most important conditions of a license agreement, to wit: the period of time for which it was to run and the extent of the license. You kindly agreed to incorporate the limitation on the period of time such license was to run, but declined to incorporate a limitation on the extent of such license. As the license granted to the Government by the whole agreement is limited by the opening clause of Article second, the licenses we grant to others at the instruction of the Government must necessarily be limited to the same extent as the license to the Government is limited.

"It was not our intention, and I am sure it was not the intention of those with whom we negotiated, that the Government could require us to grant a license to a manufacturer to use the invention for purely commercial purposes; yet unless some limiting language is included in Article fourth, such would be the effect of the Article.

"I, therefore, must respectfully reiterate my request that Article fourth be clarified to the effect that the licenses we are required to grant shall be limited to the same extent as is the license granted to the Government.

"I will, therefore, appreciate it very much if you will give this matter your further consideration. We are, of course anxious to consummate this transaction if possible prior to June 30th so that our agreement with Consolidated may become effective; otherwise, Consolidated will be regularly obligated to make a payment of substantially more than we are willing to accept and complications would set in which might necessitate our having to change the arrangements worked out with the Royalty Adjustment Board. The reason I say this is that probably after the payment from Consolidated has accrued and become payable to my client, my client may not be able to lawfully forgive such payment without incurring a tax liability.

"I cannot help but feel that the requests I have made herein are fair, and hope that you concur with me and can cause Page 2 once again to be rewritten so that we can immediately execute the agreement and return it to you. * * *"

16. Subsequent to mailing the letter of June 18, 1943, to Wright Field, Mr. Trippet received a telephone call from Captain Bruington on June 24, 1943, and contemporaneous with the telephone call Mr. Trippet wrote a memorandum for his file containing the substance of the telephone call, which memorandum read as follows:

"On June 24 Captain Bruington phoned me from Wright Field asking about the changes I wished made. He agreed that my requests were in order,

and we worked out language which would 'save face' for Major Bowes and still accomplish what I want. In the last sentence of article first, we agreed to insert 'other than as herein contemplated' after 'claim,' and in article fourth to insert 'and for the purposes herein specified' after 'agreement.' "

17. On June 25, 1943, Captain Bruington sent the following interoffice memorandum to Major Bowes (defendant's exhibit 3):

"1. The following changes in the subject contract have been approved orally by Mr. Trippet on behalf of Davis Airfoils, Inc., and meet with the approval of Captain Beveridge and Captain Lane, of the Patent Liaison Branch. I likewise approved them.

"First Paragraph: Last sentence: After the word 'claims' in the third from last sentence, insert the words 'other than as provided herein.'

"Fourth Paragraph: After the word 'Agreement' in the second line, insert the words 'and for the purposes herein specified.'

"2. If these meet with your approval, it is deemed desirable to expedite the redrafting of Page Two of the Agreement in order that the contract may be executed by all parties prior to June 30, 1943."

18. Thereafter plaintiff received a letter dated June 25, 1943, in which the major changes originally proposed in plaintiff's letter of June 7, 1943, were accepted by defendant. The first paragraph of defendant's letter of June 25, 1943 (plaintiff's exhibit 26) read as follows:

"This will acknowledge receipt of your letter dated 18 June 1943, requesting certain changes be incorporated on page 2 of the subject contract. These changes have been made."

19. Following the foregoing chain of correspondence the contract was executed by the parties. Paragraphs 1, 2, and 4 of the contract in suit are herein set forth, with the crucial phraseology italicized.

"*First:* Licensor hereby grants to Government, commencing as of April 1, 1943, a nonexclusive right and license as hereinafter limited, under each and all of the claims of the said Patents No. 1,942,688 and No. 2,281,272 and under all other patents, applications for patents, and present and future inventions or improvements, whether patented or unpatented, relating to airplane wings which now or hereafter may be owned or controlled by Licensor, or under which Licensor may have any right to grant licenses during the term hereinafter defined (all hereinafter sometimes collectively referred to as 'the inventions'), to *manufacture and sell or otherwise dispose of or cause to be manufactured and sold or otherwise disposed of throughout the United States and its territories, and to use throughout the world,* airplane wings which embody said inventions. Licensor agrees not to make any claim *other than as provided herein* against Government by virtue of any delivery, sale or other disposition of airplanes upon which a royalty has been paid to Licensor.

"*Second:* The rights and license herein granted and conveyed shall be *for Governmental purposes only* and shall continue in effect until the end of the present National Emergency and for six (6) months thereafter, except that contracts entered into before the end of such period may be completed and all of the airplane wings which embody such inventions on hand at the end of said period, or completed as permitted herein, may be used, sold or disposed of without restriction.

"The term 'present National Emergency' as used herein shall be deemed to mean the present National Emergency declared by the Congress of the United States or by Presidential Proclamation (and whether or not involving war) as from time to time continuing or extended.

\*   \*   \*   \*   \*   \*

*Fourth:* Licensor hereby agrees to grant, during and for a period of time coextensive with the life of this Agreement *and for the purposes herein spec-*

*ified,* to such manufacturers as may be designated by Government, non-exclusive licenses to manufacture, use and sell airplane wings, embodying the inventions hereby licensed, at· a royalty not to exceed Five Dollars and No Cents ($5.00) per airplane. [Italics supplied.]"

### The Davis Patents

20. It is a general rule with respect to patent licenses that the licensee waives his right to attack validity unless he expressly reserves the right to do so. In the Fowler contract, which was used as a model, this right was expressly reserved in the following phraseology:

"3. It is hereby agreed that the Government does not by accepting this license admit the validity of any of the patents referred to herein or otherwise involved and that any and all defenses which the Government may now or hereafter have in connection with any of said patents are hereby reserved to the Government, all without waiving, forfeiting or impairing any rights under this license."

21. In the first working draft and more particularly in that part designated as defendant's exhibit 1, paragraph V departed from the reservation set forth above in that it specified—

"Licensee agrees that it shall not, during the currency of this license, dispute the validity of the issued Letters Patent and that it will require each of its sub-licensees' to agree' not to dispute the· validity· of said issued Letters Patent, during the currency hereof."

This provision does not appear in any subsequent draft nor does it appear in the final draft.

22. With the entry of Major Bowes into the negotiations, the preparation of what was in many respects the last draft of the entire contract was completed (plaintiff's exhibit 20). In the retyped copy of this (plaintiff's exhibit 30) which Mr. Trippet took with him on his return to Los Angeles,

paragraph thirteenth of the license contract was entitled "Reservation of Rights" and read as follows:

"It is understood that, notwithstanding this agreement, Government may proceed at any time, under the provisions of Public Law 768, 77th Congress, 2nd Session, and that as to the license hereby granted to Government of [or] hereafter issued at the request of Government, the royalties payable hereunder, or thereunder, as the case. may be, will be subject to the provisions of that Act. Without limiting the generality of the foregoing, *it is agreed that Government reserves all rights set forth in title 60 of the Revised Statutes as to any action based in whole or in part upon the making, using or selling of any structure or invention in which Licensor or any one claiming under Licensor has or claims to have any interest. Said rights may be asserted by Government at any time before or after the institution of an action by Licensor under this agreement or any pertinent law or statute.* [Italics supplied.]"

None of the letters received from Trippet subsequent to the preparation of the draft (plaintiff's exhibit 20) made any objection to this reservation provision. The phraseology included in the emphasized portion of paragraph thirteenth as quoted above is included in the executed agreement between the parties.[2]

Plaintiff insists that defendant's motion for an order remanding the case to the Commissioner for the taking of further evidence as to the validity of claim 13, supra, should be denied on the grounds (1) that as a matter of law the defendant, being a licensee, may not question the validity of the patents covered by the license agreement and (2) that the evidence which the defendant desires to submit relative to claim 13 is not newly discovered evidence.

We are of the opinion from a consideration of the agreement of June 29, 1943, as a whole and particularly in view of paragraph thirteen thereof, quoted above,

---

2. Title 60 is the basic group of patent statutes and sets forth what shall constitute a valid patent.

that 'the defendant expressly reserved the right in said agreement, in the circumstances presented in this case, to question the validity of the patents covered by the agreement of June 29, supra, and submit evidence in support of such claim of invalidity. It is the general rule, well established by the decisions of the courts, with respect to patent licenses, that a licensee waives his right to attack validity only in those cases where the right to do so is not expressly reserved. We think it clear that in the circumstances presented by this case the defendant under paragraph thirteen of the license agreement expressly reserved the right to interpose the defense of invalidity of the patents covered by said agreement. No case has been called to our attention, and we have found none, which holds that in circumstances such as are here presented a licensee is precluded from attacking the validity of the patents involved. Title 60 of the Revised Statutes, Act of July 8, 1870, 16 Stat. 200 et seq., relates to Patents, Trademarks, and Copyrights [1952 Revision 35 U.S.C.A. § 101 et seq.] Chapter I of this title relates to patents. Section 4886, as interpreted by the courts from time to time since its enactment, defines an invention upon which a valid patent may issue. Various sections of this chapter contain defensive rights. The right of a defendant in a suit involving the use of an alleged invention covered by a patent, to interpose the defense of invalidity is clearly contained in Sections 4886 and 4888. Paragraph thirteen of the license agreement of June 29, 1943, clearly and specifically reserved to the Government *all rights* set forth in Title 60 of the Revised Statutes.

The plaintiff's first objection to defendant's motion is therefore denied.

■ With reference to plaintiff's second objection to defendant's motion, we are of opinion that a proper showing has been made by the defendant of newly discovered evidence not available for submission at the time of the trial of the case before the Commissioner, and that in view of the showing made by defendant in its motion for remand for further proof, and the exhibits attached to said motion, the case should be remanded to the Commissioner for the taking of further evidence as to the validity of claim 13. See Rule 48 of the rules of this court, 28 U.S.C.A.

For the reasons stated, it is ordered by the court that this case be and the same hereby is remanded and referred to Commissioner Gordon, for the taking of such further proof as may be offered by defendant relating to claim 13 of patent No. 1,942,688, and such rebuttal evidence as may be offered by plaintiff with reference thereto. The case shall not be reopened for further proof by the party as to any other phase or claim with respect to the agreement of June 29, 1943, or the patents covered thereby.

JONES, Chief Judge, and HOWELL, MADDEN, and WHITAKER, Judges, concur.