Whitaker, Judge,
concurring:
The majority opinion says the patents upon which plaintiff sues are invalid because they require experimentation “with the values to be used in the formulas as expressed in claims 1-12, inclusive, and claim IB.” For this reason it is decided that plaintiff is not entitled to recover. I am not sure that I understand what the maj ority opinion means. I prefer to rest the decision on the ground that the license granted the defendant covers the sales of which the plaintiff complains. I think it does.
Laramore, Judge, took no part in the consideration or decision of this case.
FINDINGS OF FACT
The court, having considered the evidence, the report of Commissioner Hayner H. Gordon, and the briefs and argument of counsel, makes findings of fact as follows:
The report of the commissioner in this case was originally filed on April 28,1952.
On May 27, 1952, the defendant filed with the Court its motion asking that the case be referred to a commissioner for the purpose of receiving newly discovered evidence as to the validity of claim 13 of the Davis patent No. 1,942,688.
Pursuant to such motion and in an opinion of March 3, 1953, the court, 124 C. Cls. 499, remanded this case to the commissioner for the taking of such further proof as might be offered by defendant relating to claim 13 of the Davis patent, No. 1,942,688, and such rebuttal evidence as might be offered by the plaintiff with reference thereto.
Pursuant to such order of remand, the commissioner now makes the following amended report of his findings of fact:
*522 1. Davis Airfoils, Inc., is a corporation organized and existing under the laws of the State of California, with its principal offices at 334% North Sycamore Street, Los Ange-les, California.
2. Plaintiff is the licensee of certain patents relating to the cross-sectional profile designs of airplane wings in front to rear section (currently known and referred to as the “Davis Wing”), for which United States Letters Patent No. 1,942,-688 were issued January 9,1934, and No. 2,281,272 on April 28,1942. Copies of these patents are in evidence' as defendant’s exhibits 10 and 11 respectively.
3. On June 29,1943, plaintiff entered into a license agreement with defendant, identified as “Contract W-535 ac~ 40218 (10569),” and effective on April 1, 1943. This contract is hereinafter referred to as the contract in suit.
A true copy of this contract is appended to the petition as Appendix A, except that pursuant to a stipulation filed by the parties, the last sentence of paragraph “First” of the contract should be amended by removing the parentheses and by making plural the word “airplane.”
The corrected sentence then reads:
Licensor agrees not to make any claim other than as provided herein against Government by virtue of any delivery, sale or other disposition of airplanes upon which a royalty has been paid to Licensor.
The contract in suit specifically states that it “shall continue in effect until the end of the present National Emergency and for six (6) months thereafter.” The contract was in full force and effect when the transactions involved in this case occurred.
The plaintiff alleges breach of the terms of this contract by the unauthorized disposal by the Government of certain airplanes.
4. Prior to the effective date of the aforesaid contract in suit and on or about February 9, 1938, the plaintiff had entered into a license agreement with Consolidated Aircraft Corporation providing for the payment to plaintiff of a royalty for the use of the Davis airfoil or wing. This royalty was based on a sliding scale, beginning at % of 1% of the *523 selling price of the airplane less engines, propellers, and usual Government-furnished materials, and decreasing to a minimum of %6 of 1% of such selling price. This license agreement was in part as follows:
In the event that this Corporation uses the Davis airfoils on any experimental airplane, we agree to pay Mr. Davis $2,500.00 for each first prototype employing same. For subsequent airplanes of the same model, we agree to pay royalties based upon the selling price of the airplanes (not including spares), less engines, propellers, and the usual Government furnished material, according to the following table as full compensation for the use of said airfoils:

Percent

0 to $1,000,000- %
$1,000,000 to $5,000,000_ %
$5,000,000 to $10,000,000_ %
$10,000,000 and upwards_ %
When the total of royalties paid aggregates $50,000 the above scale of royalties will be reduced 50%. Said payments of royalties to be made quarterly from date of first use, within ten (10) days after the end of each quarter, and to cover all airplanes equipped with Davis Airfoil Sections produced in the said quarterly period, such royalty payments to be accompanied by a statement showing the number, type, and selling price of aircraft upon which the airfoil has been used.
This license agreement, plaintiff’s exhibit 9, is made a part of this finding by reference.
5. Royalties in substantial amounts were paid under this license agreement, at the rates provided in the sliding scale, on 166 airplanes purchased by Great Britain directly from Consolidated in 1941 and prior thereto, and also on aircraft subsequently purchased for the United States Government. These royalties were paid over a period beginning in 1939 and extending to the effective date of the contract in suit (April 1, 1943). There is no evidence of any direct purchases of airplanes by Great Britain from Consolidated subsequent to 1941.
At the time of completion of the British contracts in 1941 the royalty rate being paid upon the airplanes sold directly to Great Britain was %6 of 1% of the net cost, with certain deductions.
*524 At the time the contract in suit became effective the royalty rate on the B-24 airplanes paid by Consolidated was %6 of 1% or $92.71 per plane at the then selling price of the planes (plaintiff’s exhibit 29).
6. The negotiations that ultimately led up to the contract in suit were initiated by a letter dated April 2, 1943, from The Royalty Adjustment Board at Wright Field to the plaintiff. This letter read as follows:
1. The matter of your license agreement with the Consolidated Aircraft Corporation has been referred to The Royalty Adjustment Board for consideration under Public Law 768, 77th Congress, 2nd Session.
2. Before proceeding further in the matter, the Board is desirous of obtaining relevant facts pertaining to the agreement, the patent and patent applications involved, and the royalties paid and to be paid thereunder. It will be appreciated if you will indicate the earliest convenient date when an informed representative of your corporation will confer with the Board at this office.
Pursuant to this letter, the plaintiff, represented by David R. Davis, and its counsel, Oscar A. Trippet, conferred at Wright Field with Capt. Walter R. Bruington, executive officer of The Royalty Adjustment Board.
Initially the discussions concerned a reduction under the Royalty Adjustment Act in the amount of the royalty set forth in the Consolidated Aircraft Corporation contract. Subsequent to the initial discussions there was also some discussion of a settlement for alleged past infringement by Government contractors. The discussions, however, later turned to the negotiation of a license contract between the plaintiff and the Government, which contract, when executed, became the contract in suit.
In connection with this phase of the matter, a Major Bowes of the Procurement Division, which had contractual authority, entered into the picture as the responsible officer at Wright Field in charge of the negotiations and the final approval of the contract. Captain Bruington still assisted in an advisory capacity.
7. The present controversy centers about paragraphs 1, 2 and 13 of the contract in suit. The negotiations leading ultimately to paragraphs 1 and 2 are set forth below, and *525 paragraph 13 is subsequently referred to in findings 20 to 22.
Early in the negotiations a royalty rate of $5 per airplane was agreed upon. In this connection, and as expressed in the second “Whereas” clause of the contract, the plaintiff was desirous of making available the wider use of airplane wings embodying the use of its inventions and—
to have additional sources of supply for same, in the interest of facilitating the prosecution of Government’s effort in the present National Emergency.
In connection with the reduction of . the royalty rate it was plaintiff’s objective, as expressed throughout the negotiations, not to have the airplanes thus acquired by the Government disposed of in such a way as to interfere with its postwar commercial interests in this country or its foreign markets.
On the contrary, it was the expressed objective of the Government’s representatives that upon the payment of a royalty on an airplane the plaintiff could not make a further claim against the Government by virtue of any delivery, sale or other disposition of that particular airplane.
8. In the preparation of the preliminary drafts of paragraphs 1 and 2 of the contract in suit, paragraph 1 of a previous license agreement known as the Fowler contract and also relating to airplane parts (plaintiff’s exhibit 17) was used as a guide. Paragraph 1 of the Fowler agreement reads as follows:
1. The Licensor hereby grants to the Government an irrevocable, nonexclusive right and license under each of the claims of the patents hereinbefore in the preamble of this license agreement enumerated, and/or referred to, and under all other patents and/or applications for patents and/or present and future inventions or improvements whether patented or unpatented relating to the Commodity herein defined and/or to the manufacture thereof which now or hereafter may be owned or controlled by Licensor, or under which Licensor may have any right to grant licenses, during the term hereinafter defined, to manufacture, use, sell, and/or otherwise dispose of the Commodity including disposition to lend-lease countries under the act of March, 11, 191¡1, as amended, and/or cause the Commodity to be manufactured, used, sold and/or otherwise disposed of *526 throughout the world, and to employ or have employed, in any manner deemed necessary or expedient for the foregoing purposes, any designs, specifications, drawings, or other information, relating to the Commodity, supplied by Licensor to the Government or to nominees or representatives thereof. It is understood that the license herein granted is limited to the manufacture, use, sale or other disposition of the Commodity, or information relating thereto, by or for the Government for Governmental purposes. [Italics supplied.]
9. The first working draft comprised two sheets containing the “Whereas” clauses and certain other matter (defendant’s exhibit 1) and a single sheet containing a tentative draft of paragraphs 1 and 2 of the contract (plaintiff’s exhibit 18).
The first paragraph of this draft departed from the language of the Fowler contract by eliminating reference to lend-lease business and by eliminating language that would authorize the Government to sell or otherwise dispose of aircraft employing the Davis wing throughout the world.
The second paragraph of this draft differed from the Fowler contract by changing the wording from “Governmental purposes” to “military purposes” and added a clause stating that the Government might at any time and from time to time dispose of aircraft manufactured under the license without restriction.
10. In the next working draft (plaintiff’s exhibit 19) paragraph 1 was changed in the opening clause, which refers to licensor granting to the Government a nonexclusive right and license, by adding after the word license, “as hereinafter limited,” and by the inclusion of the following language at the end of paragraph 1:
The right to manufacture and sell herein granted may be exercised only in the United States. The right to use, however, shall extend to all parts of the world.
In this working draft the language of paragraph 2 relating to the use of the licensed airplanes by the Government was changed from “military purposes” to “its Governmental purposes.”
11. At a subsequent conference at which Captain Bruing-ton, Mr. Trippet and Major Bowes were present, the next draft, and what was in many respects the last draft, of the *527 entire contract was completed (plaintiff’s exhibit 20). At this conference the provisions of Section 2 were the subject of further discussion and it was agreed that the terms of this section could be further clarified so as to more simply express the intent of the parties. These changes were incorporated in a subsequent mimeographed copy of the contract and were carried into the final draft as it was executed by the parties.
Following this conference Mr. Davis and Mr. Trippet returned to Los Angeles, Mr. Trippet carrying with him a retyped copy of plaintiff’s exhibit 20, such retyped copy being identified as plaintiff’s exhibit 80. Paragraphs 1 and 2 of plaintiff’s exhibits 20 and 30 read as follows:
1. Licensor hereby grants to Government, commencing as of April 1,1943, a nonexclusive right and license as hereinafter limited, under each of the said patents and under all other patents or applications for patents or present and future inventions or improvements, whether patented or unpatented, relating to the airplane wings herein defined, which now or hereafter may be owned or controlled by Licensor, or under which Licensor may have any right to grant licenses during the term hereinafter defined, to manufacture and sell or otherwise dispose of or cause to be manufactured and sold or otherwise disposed of throughout the United States and its territories, and to use throughout the world, airplane wings which embody said inventions. Licensor agrees not to make any claim against Government by virtue of any delivery, sale, or other disposition of airplanes upon which a royalty was paid under the terms of this Agreement.
. 2. The License described in Paragraph First hereof is limited to the manufacture, use, sale, or other disposition of airplane wings which embody said inventions, to or for, directly or indirectly, Government for its Governmental purposes during the continuance of the present National Emergency and for six months after the termination thereof; provided, however, that any bona fide contracts let for the manufacture of airplane wings which embody said inventions, and which are not completed prior to the termination hereof, may be completed ; and provided further, that at any time and from time to time after the termination hereof, the Government may, without restriction, use, sell or otherwise dispose of, or cause to be used, sold or otherwise disposed of, any of the airplanes manufactured under this License.
*528 The term “present National Emergency” as used herein shall be deemed to mean the present National Emergency declared by the Congress of the United States or by Presidential Proclamation (and whether or not involving war) as from time to time continuing or extended.
12. Following the return of Mr. Davis and Mr. Trippet to Los Angeles, plaintiff received a letter dated June 3, 1943, bearing the initials of Major Bowes and enclosing three mimeographed copies of the purported contract, with the request that it be duly executed and returned. There were, however, certain changes in the mimeographed copy which differed from the final draft considered by the parties at Wright Field. These changes involved paragraphs 1 and 2 and also paragraph 4, and gave rise to a subsequent chain of correspondence between Mr. Trippet and Major Bowes, of the Procurement Section at Wright Field. For convenience, these paragraphs of the mimeographed contract are set forth below:
FIRST
Licensor hereby grants to Government, commencing as of April 1, 1943, a nonexclusive right and license as hereinafter limited, under each and all of the claims of the said Patents No. 1,942,688 and No. 2,281,272 and under all other patents, applications for patents, and present and future inventions or improvements, whether patented or unpatented, relating to airplane wings which now or hereafter may be owned or controlled by Licensor, or under which Licensor may have any right to grant licenses during the term hereinafter defined (all hereinafter sometimes collectively referred to as “the inventions”), to manufacture and sell or otherwise dispose of or cause to be manufactured and sold or otherwise disposed of throughout the United States and its territories, and to use throughout the world, airplane wings which embody said inventions. Licensor agrees not to make any claim against Government by virtue of any delivery, sale or other disposition of airplanes upon which a royalty has been paid to Licensor.
SECOND
The rights and license herein granted and conveyed shall be for Governmental purposes only and shall continue in effect until the end of the present National *529 Emergency and for six (6) months thereafter, except that contracts entered into before the end of such period may be completed and all of the airplane wings which embody such inventions on hand at the end of said period, or completed as permitted herein, may be used, sold and/or disposed of without restriction.
The term “present National Emergency” as used herein shall be deemed to mean the present National Emergency declared by the Congress of the United States or by Presidential Proclamation (and whether or not involving war) as from time to time continuing and/or extended.
FOURTH
Licensor hereby agrees to grant, during and for the life of this Agreement, to such manufacturers as may be designated by Government, nonexclusive licenses, to manufacture, use and sell airplane wings, embodying the inventions hereby licensed, at a royalty not to exceed Five Dollars and No Cents ($5.00) per airplane.
13. Upon receipt of the mimeographed contract referred to in the previous finding and under date of June 7, 1943, Mr. Trippet wrote to the Procurement Section at Wright Field, which letter is quoted in part below (plaintiff’s exhibit 23):
Your letter of June 3rd has just been received.
The changes made from the draft of the Agreement agreed upon while I was in Wright Field are all satisfactory, and in most instances improve upon the earlier draft, except two. I should like to have the words “under the terms of this Agreement,” added at the end of Paragraph First on Page Two. If these words are omitted from the Agreement, airplanes could be manufactured and a royalty paid in any amount, say, $1.00 per airplane or they could be used for purposes other than Governmental purposes and we would have no claim on account thereof. This does not seem to be fair and I am sure you will not object to adding the wording suggested.
The other change which I would like to have made is in Paragraph Fourth. After the word “for” in line one, add “a period of time coextensive with,” and after the word “sell” in the third line add “for Governmental purposes only.” These amendments should not be objectionable to you, and confine our obligation to grant licenses to the principal terms and conditions of our license to the Government.
*530 If you concur with these amendments, it will necessitate the rewriting of Page Two, and as such rewriting is necessary, may I respectfully suggest that we omit the “and/or” appearing in the next to the last line of the first paragraph of Article Second, and the last line of that Article. They do not appear at any other place in the Agreement.
If you concur in making these changes and will cause Page Two to be rewritten and mimeographed and forward me a set, I will cause the Agreement to be executed immediately and returned to you.
While I am waiting to hear from you, I have requested Consolidated to execute an Agreement between the Consolidated and Davis Airfoils so that we will be in a position to execute the contract with the Government immediately.
‡ $ $ $ $
14. In a letter dated June 11, 1943, bearing the initials of Maj. T. F. Bowes, the Procurement Section at Wright Field wrote plaintiff in part as follows (plaintiff’s exhibit 24) and enclosed a redraft of page 2 (defendant’s exhibit 2)!
1. This will acknowledge receipt of your letter of June 7,1943, requesting certain changes be made in the subject contract.
2. The request contained in the second paragraph of your letter to the effect that the words “under the terms of this Agreement,” be added at the end of paragraph First on page 2 is not acceptable to the Government. _ It is the understanding of this office that if Davis Airfoils, Inc., receives a royalty ¡payment by virtue of any delivery, sale or other disposition of airplanes no further claim will be made against the Government. The purpose of the inclusion of the language in question was to avoid the creation of any problem with reference to Lend-Lease or a similar problem. Further, it is apparent that no payment made to Davis Airfoils, Inc., which does not conform to an Agreement to which your company is a party would be within the legal definition of the term “royalty payment.”
3. The request that the words “for Governmental purposes only” be added after the word “sell” in the third line is not acceptable to the Government for the reason that again it may create a problem with reference to Lend-Lease airplanes.
*531 4. The remaining changes suggested in your letter are agreeable and have been made.
5. Herewith are ten (10) copies of Page 2 which will reflect the changes which are agreeable to the Government. It is requested that you substitute these pages in the copies now in your possession and return to the Government forthwith three (3) signed numbers of the contract.
* Sj< #
15. Mr. Trippet on June 18,1943, replied in part as follows (plaintiff’s exhibit 25):
I am sorry that I am not yet in a position to advise my client to execute the agreement in its present form.
I am not particular as to just what language is used in the two places referred to in my letter of June 7th and referred to in Paragraphs 2 and 3 of your letter of June 11th. I will appreciate, however, your working out or suggesting some language that will be satisfactory to you and will, at the same time, meet my objections.
Your Major Bowes with whom I worked on the final draft of the agreement before I left Wright Field will recall our discussion in connection with these two points.
The draft of the agreement agreed upon before I left Wright Field contained the words at the end of Article first on Page 2 which I requested to be included in the mimeographed copy. Not anticipating that the words would be eliminated, I was unable before leaving Wright Field to explain all of my reasons for wanting them included. In my letter of June 7th I pointed out what I thought would be a reasonable interpretation of the last sentence of Article first by giving two illustrations of situations which I felt might foreclose us from making a claim against the Government, when as a matter of 'fact terms of the agreement had not been lived up to.
In Paragraph 2 of your letter of the eleventh, you say, “It is the understanding of this office that if Davis Airfoils, Inc., receives a royalty payment by virtue of any delivery, sale or other disposition of airplanes no further claim will be made against the Government.” Such, of course, is not our understanding, nor could it have been the understanding at the time we completed the final draft of the agreement before I left Wright Field as the language which I now wish included in Article first was included at that time. Neither do I see how such an understanding could be in your mind when you read the opening clause of Article second of the agreement in its present mimeographed form. That *532 clause reads, “The rights and license herein granted and conveyed shall be for Governmental purposes only * *
Thus, it is clear that our understanding could not have been that we have no claim for a royalty paid by virtue of “any delivery.” May I respectfully suggest that I do not believe that the licensor can be called upon to waive a claim except for royalty payments made in accordance with the terms of the agreement.
If the particular language which was contained in the form of the final draft of the agreement at the time I left Wright Field is objectionable, as it now seems to be, may I suggest that perhaps it would not be objectionable to say “licensor agrees not to make any claim against Government by virtue of any delivery, sale, or disposition of airplanes upon which a royalty has been paid, in accordance herewith, to licensor.”
You stated in the last sentence of Paragraph 2 of your letter of June 11th that no payment made to Davis which did not conform with the agreement would be within the legal definition of the term “royalty payment” as used in Article first. I believe the sentence just suggested probably clarifies this thought. As above indicated, any clarification of the sentence in question will be satisfactory with me provided it is clear that the broad statement made by you as to your understanding in the second sentence of Paragraph 2 of your letter of June 11th is not true. In other words, I feel that it is necessary that there be some limitation so that the agreement will not imply that the understanding is as you indicated it was.
I next asked you in my letter of June 7th to amend Article fourth in two particulars. You will recall that in the final draft of the agreement as prepared when I left Washington, Article fourth read “licensor agrees to grant at the instruction of Government to such manufacturers as may be designated by Government, nonexclusive licenses to manufacture, use and sell airplane wings embodying the inventions hereby licensed, upon the same terms, conditions and limitations as those contained in this license * *
Article fourth, as rewritten by you, in the mimeographed agreement would have required the licensor to grant licenses upon terms that were not defined except as to the amount of the royalty. I requested you to incorporate in Article fourth the two other most important conditions of a license agreement, to wit: the period of time for which it was to run and the extent of the license. *533 You kindly agreed to incorporate the limitation on the period of time such license was to run, but declined to incorporate a limitation on the extent of such license. As the license granted to the Government by the whole agreement is limited by the opening clause of Article second, the licenses we grant to others at the instruction of the Government must necessarily be limited to the same extent as the license to the Government is limited.
It was not our intention, and I am sure it was not the intention of those with whom we negotiated, that the Government could require us to grant a license to a manufacturer to use the invention for purely commercial purposes; yet unless some limiting language is included in Article fourth, such would be the effect of the Article.
I, therefore, must respectfully reiterate my request that Article fourth be clarified to the effect that the licenses we are required to grant shall be limited to the same extent as is the license granted to the Government.
I will, therefore, appreciate it very much if you will give this matter your further consideration. We are, of course, anxious to consummate this transaction_ it gossible prior to June 30th so that our agreement with bnsolidated may become effective; otherwise, Consolidated will be regularly obligated to make a payment of substantially more than we are willing to accept and complications would set in which might necessitate our having to change the arrangements worked out with the Royalty Adjustment Board. The reason I say this is that probably after the payment from Consolidated has accrued and become payable to my client, my client may not be able to lawfully forgive such payment without incurring a tax liability.
I cannot help but feel that the requests I have made herein are fair, and hope that you concur with me and can cause Page 2 once again to be rewritten so that we can immediately execute the agreement and return it to you.
* * * * *
16. Subsequent to mailing the letter of June 18, 1943, to Wright Field, Mr. Trippet received a telephone call from Captain Bruington on June 24, 1943, and contemporaneous with the telephone call Mr. Trippet wrote a memorandum for his file containing the substance of the telephone call, which memorandum read as follows:
*534 On June 24 Captain Bruington phoned me from iWright Field asking about the changes I wished made. He agreed that my requests were in order, and we worked out language which would “save face” for Major Bowes and still accomplish what I want. In the last sentence of article first, we agreed to insert “other than as herein contemplated” after “claim,” and in article fourth to insert “and for the purposes herein specified” after “agreement.”
17. On June 25,1943, Captain Bruington sent the following interoffice memorandum to Major Bowes (defendant’s exhibit 3):
1. The following changes in the subject contract have been approved orally by Mr. Trippet on behalf of Davis Airfoils, Inc., and meet with the approval of Captain Beveridge and Captain Lane, of the Patent Liaison Branch. I likewise approved them.
First Paragraph: Last sentence: After the word “claims” in the third from last sentence, insert the words “other than as provided herein.”
Fourth Paragraph: After the word “Agreement” in the second line, insert the words “and for the purposes herein specified.”
2. If these meet with your approval, it is deemed desirable to expedite the redrafting of Page Two of the Agreement in order that the contract may be executed by all parties prior to June 30,1943.
18. Thereafter plaintiff received a letter dated June 25, 1943, in which the major changes originally proposed in plaintiff’s letter of June 7,1943, were accepted by defendant. The first paragraph of defendant’s letter of June 25, 1943 (plaintiff’s exhibit 26) read as follows:
This will acknowledge receipt of your letter dated 18 June 1943, requesting certain changes be incorporated on page 2 of the subject contract. These changes have been made.
19. Following the foregoing chain of correspondence the contract was executed by the parties. Paragraphs 1, 2, and 4 of the contract in suit are herein set forth, with the crucial phraseology italicized.
First: Licensor hereby grants to Government, commencing as of April 1, 1943, a nonexclusive right and license as hereinafter limited, under each and all of the *535 claims of the said Patents No. 1,942,688 and No. 2,281,272 and under all other patents, applications for patents, and present and future inventions or improvements, whether patented or unpatented, relating to airplane wings which now or hereafter may be owned or controlled by Licensor, or under which Licensor may have any right to grant licenses during the term hereinafter denned (all hereinafter sometimes collectively referred to as “the inventions”), to manufacture and sell or otherwise dispose of or cause to be manufactured and sold or otherwise disposed of throughout the United States and its territories, and to use throughout the world, airplane wings which embody said inventions. Licensor agrees not to make any claim other than as provided herein against Government by virtue of any delivery, sale or other disposition of airplanes upon which a royalty has been paid to Licensor.
Second: The rights and license herein granted and conveyed shall be for Governmental purposes only and shall continue in effect until the end of the present National Emergency and for six (6) months thereafter, except that contracts entered into before the end of such period may be completed and all of the airplane wings which embody such inventions on hand at the end of said period, or completed as permitted herein, may be used, sold or disposed of without restriction.
The term “present National Emergency” as used herein shall be deemed to mean the present National Emergency declared by the Congress of the United States or by Presidential Proclamation (and whether or not involving war) as from time to time continuing or extended.
$ ‡ ‡ #
Fourth: Licensor hereby agrees to grant, during and for a period of time coextensive with the life of this Agreement and for the purposes herein specified, to such manufacturers as may be designated by Government, non-exclusive licenses to manufacture, use and sell airplane wings, embodying the inventions hereby licensed, at a royalty not to exceed Five Dollars and No Cents ($5.00) per airplane. [Italics supplied.]
THE DAVIS PATENTS
20. It is a general rule with respect to patent licenses that the licensee waives his right to attack validity unless he expressly reserves the right to do so. In the Fowler contract, *536 which was used as a model, this right was expressly reserved in the following phraseology:
3. It is hereby agreed that the Government does not by accepting this license admit the validity of any of the patents referred to herein or otherwise involved and that any and all defenses which the Government may now or hereafter have in connection with any of said patents are hereby reserved to the Government, all without waiving, forfeiting or impairing any rights under this license.
21. In the first working draft and more particularly in that part designated as defendant’s exhibit 1, paragraph Y departed from the reservation set forth above, in that it specified—
Licensee agrees that it shall not, during the currency of this license, dispute the validity of the issued Letters Patent and that it will require each of its sub-licensees to agree not to dispute the validity of said issued Letters Patent, during the currency hereof.
This provision does not appear in any subsequent draft nor does it appear in the final draft.
22. With the entry of Major Bowes into the negotiations, the preparation of what was in many respects the last draft of the entire contract was completed (plaintiff’s exhibit 20). In the retyped copy of this (plaintiff’s exhibit 30) which Mr. Trippet took with him on his return to Los Angeles, paragraph thirteenth of the license contract was entitled “Reservation of Rights” and read as follows:
It is understood that, notwithstanding this agreement, Government may proceed at any time, under the provisions of Public Law 768, 77th Congress, 2nd Session, and that as to the license hereby granted to Government of [or] hereafter issued at the request of Government, the royalties payable hereunder, or thereunder, as the case may be, will be subject to the provisions of that Act. Without limiting the generality of the foregoing, it is agreed that Government reserves all rights set forth in title 60 of the Revised Statutes as to any action based in whole or in fart upon the making, using or selling of any structure or invention in which Licensor or any one claiming under Licensor has or claims to have any' interest. Said rights may be asserted by Government at any time before or after the institution of an action by *537 Licensor under this agreement or any pertinent law. or statute. [Italics supplied.]
None of the letters received from Trippet subsequent to the preparation of the draft (plaintiff’s exhibit 20) made any objection to this reservation provision. The phraseology included in the emphasized portion of paragraph thirteenth as quoted above is included in the executed agreement between the parties.[2]
23. The first patent forming the basis of the contract in suit is patent No. 1,942,688 issued to David E. Davis January 9, 1934, on an application filed in the United States Patent Office on May 25, 1931. A copy of this patent is in evidence as defendant’s exhibit 10 and is made a part of this finding by reference.
The subject matter of this invention is well described in the preliminary portion of the specifications, which is quoted as follows:
This invention relates to a construction of foils to be driven through a fluid, and particularly concerns the profile of the foil in its front to rear section. While the invention may be applied to a foil used in any medium, it has its greatest usefulness when applied in the construction of airfoils for air vehicles.
The upper surface of a fluid foil should have a profile, which, when the foil is driven through the fluid, will develop a region of reduced pressure on the upper side of the foil, and the under side of a foil should have a profile which will develop a region of increased pressure on the under side of the foil. These differential pressures result in a force which may be resolved into a lift component perpendicular to the direction of movement and a drag component parallel to the direction of movement.
For any given upper curve of a foil profile there is but one best complementary lower curve, that is to say, one most efficient complementary lower curve. _ The upper and lower curves of the profile of a fluid foil each affects the fluid flow around the other and they are, therefore, interdependent.
The general object of this invention is to provide foils having profiles in their fore-and-aft sections whose upper and lower curves are mutually dependent and *538 have a particular relationship, and to provide a formula which if employed in laying out the profile lines for the upper and lower surfaces of the foils will determine a definite relationship for each given type of foil.
A further object of the invention is to provide a foil, the profile of which is determined by a formula, such as referred to above, and having two variable coefficients, these variable coefficients being constant for the development of the top and bottom curves of any given foil section, the value of these coefficients determining the shape of the profile; also to provide a foil in which, when the upper profile has a definite form, a lower profile line can be determined to correspond with the determined upper profile line and all in accordance with the same formula.
24. The specification and claims with the exception of claim 7 set forth four formulas which include two variables referred to in the formulas respectively as A and B. These formulas are of the type used in mathematics by means of which curves may be plotted with respect to X and Y axes, the character or contour of the curves being dependent upon the variables used in the formulas. The use of these formulas in plotting the cross section of foils or airfoils, as known in the aviation art, is exemplified by the figure of this patent, which shows a cross section of an airfoil plotted in accordance with the formula value A=0.717257 and B=0.208228. A reproduction of this figure follows.

*539 25. The specification states as follows with, respect to the values to be given A and B:
When B is given the same value as A, a streamline will be formed. If this value is changed, but main-tainingj. and B equal, other streamlines will be formed. If a complete streamline foil is developed in this way, and as the value of A becomes less, the maximum vertical ordinate of the streamline expressed in percentage of the chord will become smaller and the maximum ordinate will occur near the nose of the foil. If the value of A becomes greater, the reverse is true. Therefore, in the equation, a value given to A denotes the streamline from which this foil illustrated has been derived.
The value of B determines the angle of attack of the foil, in other words, the orientation of the foil in a vertical plane with respect to the horizontal axis, X, X. By varying these constants A and B one at a time, foils having special characteristics desirable for special service can be readily determined. I am using the term “varying” in its mathematical sense, and hence either of these terms of my equation may be negative while the other is positive.
In addition, the specification states that foils constructed in accordance with the formulas will give the most satisfactory results when the value of B is from 18% to 33% of the value of A. Other than this statement, the quotation given above and the values given by way of example in the specification and from which the figure reproduced from the patent was obtained, no particular values for A and B are suggested.
26. By way of example, claim 1 of the patent is quoted as follows:
1. A foil having an upper and lower profile, said profiles being correlated and conforming to the following formula, substantially as described:
suction face or upper camber Xs=sin 0 [0.6366198 (A — B )+£] +
tan 0[{1— (0.6366198) (0)}(1-A)] y5=cos 0[0.6366198(A — B) +£] -A [1- (0.6366198) (0)1
pressure face or lower camber Zp=sin 6 [0.6366198 (A — B) +B] +
tan 0[{1— (0.6366198) (0) } (1 — A) ] y„=cos 0[0.6366198(A — B) —B] — (A — 2B) [1 — (0.6366198) (0)]
The patent contains thirteen claims, the formulas being identical in all of the claims with the exception of claim 7. *540 No upper or lower limits are placed on the values of A or B in any of the formulas set forth in claims 1 to 6, inclusive, 8, 9, 11, and 12. Claim 10 states that the value of A of the formula is less or greater than 1, but the claim does not set forth any fixed lower value of A below 1 or any fixed higher value of A above 1.
Claim 18 states that B shall be 18% to 33% of the value of A but nothing further is set forth as to the value of A or its range of values.
27. Claim 7 is not limited to any specific formulas but relates broadly to a foil having a profile determined by two variable coefficients. This claim reads as follows:
7. A foil having a profile determined by a formula to determine the profile of its fore-and-aft cross section having but two variable coefficients, the lift and drag of the resultant foils being dependent upon the values of these coefficients.
28. The Journal of the Royal Aeronautical Society published July 1923 contains an article entitled “Two-Dimensional Aerofoil Theory.” A photostatic copy of this article is incorporated herein by reference as defendant’s exhibit 6.
On page 355 of defendant’s exhibit 6 and under the heading “Joukowsky Aerofoils” is discussed a series of airfoils defined by an equation having but two variable coefficients, the lift and drag of the resulting airfoils being dependent upon the values of these two coefficients. These formulas are as follows:
(1) X/e=2 cos e
(2) Y/o — 2 sin 0{m(l-|-cos 6) +/3 sin B
The defendant has prepared a sheet of six airfoils (defendant’s exhibit 7) resulting from different choices of combinations of the two variables m and beta in the above.
29. The Joukowsky formulas and the formulas of the first Davis patent, as set forth in the specification and claims 1-6, inclusive, and 8-13, inclusive, are different. Claim 7 of the first Davis patent, however, is not limited to the formulas set forth in either the specification of the first Davis patent or in the claims thereof. This claim is invalid, in view of the publication referred to in Finding 28 (defendant’s exhibit 6).
*541 30. In the example given in the first Davis patent and from which the airfoil shown in the drawing of the patent was obtained, A equals 0.717257 and B equals 0.208228. These exemplary values for the constants A and B fall within the teaching of the specification that the formula will give the most satisfactory results when the value of B is from 18% to 33 % of the value of A. The specification also teaches that a series or family of closely related foils may be developed by gradually increasing or decreasing the values of A in relationship to the values of B, and in the same way the values of B can be varied to produce another series of modified foils. The specification states that by using the formulas a certain single definite lower camber outline will he determined to correspond with the upper or suction profile line. The purpose and use of the invention is set forth as follows:
By practicing my invention, fluid profiles suitable for particular purposes may be determined with mathematical accuracy, and it is possible to develop a number of series of profiles deviating from each other gradually, and this possibility is particularly valuable because when such a series is tested, the foil having the characteristics best suited to particular service can be determined.
The upper and lower camber outlines have mutual action one upon the other, so that only a particular combination of outlines will give the most effective fluid foil. This system gives such a combination, and is at the same time adaptable to producing foils for a certain definite purpose, in other words fluid foil profiles may be determined by this system to give high lift or low drag, or a high ratio of lift to drag; also to determine effective foil outlines to meet any given structural requirement.
The specification further indicates that either of the constants A or B may be negative while the other is positive, but it does not teach that both of these constants may be negative.
31. The Government’s expert, by the selection of certain arbitrary values for A and 2?, has produced a series of eight inoperative foils, illustrated in defendant’s exhibit 4r-A in evidence. These are shown, respectively, in Figs. 1-8 inclusive, and the arbitrary figures selected for the production of these foils are tabulated below:

*542

In Figs. 1-6 inclusive, the values selected for the constants A and B are both, negative in character. Such dual negative values are outside the teaching of the patent.
In Fig. 7 the constants are both positive in character and the value of B is 10% of the value of A, and in Fig. 8 the arbitrary figures here selected for the constants are that A equals —B and also equals +2. The specification, while teaching that the values of A and B may be of opposite sign, is silent regarding either equality of the absolute magnitudes of these constants or their range of numerical values.
32. The Government expert did not especially try to obtain operative airfoils in connection with the application of the formulas. Insofar as claims 1-12 inclusive are concerned, these claims contain no limitation as to the range of numerical values of A and B. To obtain operative airfoils would require experimentation with the values to be used in the formulas. This group of claims does not particularly point out and distinctly claim an identifiable invention or discovery, and they are therefore invalid.
33. With respect to claim 13 of the first Davis patent, the Government’s expert, by the selection of certain additional arbitrary value for A and B, has produced a series of six inoperative foils, all coming within the phraseology of this claim. These inoperative foils, drawn to scale, are shown, respectively, in Figs. 1 to 6, inclusive, of defendant’s exhibit 12 (a) in evidence. The figures selected for the production of these foils are tabulated below:

*543 In Figs. 1 to 6, inclusive, the values selected for the constants A and B are both positive in character. Also, in each of these Figures the value of B is between 18% and 33% of the value of A as set forth in claim 13. In particular, in Figs. 1, 5 and 6, the value of B is 19% of the value of A; in Figs. 2 and 4, the value of B is 25% of the value of A; and in Fig. 3, the value of B is 32% of the value of A.
34. Claim 13 contains no limitations as to the value of A or its range of values (Finding 26). Nor is there set forth in this claim the value of B within the stated 18% to 33% range for any assumed value of A.
If an operative airfoil is to be built coming within the phraseology of claim 13, and having certain desired operative characteristics, it would require experimentation with the values of A and B to be used in the formulas.
Claim 13 does not particularly point out and distinctly claim an identifiable invention or discovery, and it is therefore invalid.
35. The first Davis patent, No. 1,942,688, issued January 9, 1934. The second Davis patent, No. 2,281,272, issued April 28,1942, on an application which was not filed until May 9, 1938. There was thus an interval of over four years between the issue date of the first Davis patent and the filing date of the second patent, in evidence as defendant’s exhibit 11 and made a part of this finding by reference.
The subject matter of the invention described and claimed in the second patent is similar to the first insofar as it relates to the use of four formulas, by the use of which an airfoil curve may be plotted with respect to X and Y axes. However, instead of using two variables such as A and B in the first patent, it uses but one variable, A: and in claims 1 and 3 the value of A is stated to be approximately one, while in the remaining claims, 2 and 4, A is given a value of not less than 0.93 and not greater than 1.05. The formulas utilizing the constant A are the same in all four claims. By way of example, claim 1 of this second Davis patent is quoted.
1. A fluid foil having a sectional profile producible by modification of a sectional profile conforming sub *544 stantially to the following formula, in which theta varies from zero to
~ radians
and the value of A is constant and equal to approximately one:
Xu=sin 6 (4/tt — 1) A+tan 0 (1 — 2<?/ir) (1 — A)
Y»=C0S 0 (4/ir — 1) A — A (1 — 20/tt)
Xb=sin 0 (4/tt — I) A+tan 6 (1 — 26/tt) (1 — A)
X&=cos e (4/tt+I) A — 3A (1 — 25/jr)
said modification consisting in multiplying all foil section ordinates of any camber line by a constant value whereby the foil thickness is increased or decreased depending on the value of the constant.
36. The second Davis patent describes and claims a relatively narrow range or family of airfoils defined by certain mathematical formulas having a narrow range of values.
The first Davis patent, on the contrary, describes and claims by certain mathematical formulas a larger family or group of airfoils which are defined by two variables, A and A, to which no absolute values are given and with the exception of claim 13, no specific relative values are given. The first Davis patent also indicates that the constants A and B may be varied in a mathematical sense so that one may, be negative while the other is positive.
If in the formulas of the first patent the value of B is selected to equal — A, and the numerical figure in these four formulas, 0.6366198, is written as ~ (two divided by 3.1416), then the four formulas of the first patent become identical with the four formulas of the second patent. The algebraic transformation of the formulas of the first patent into the formulas of the second patent is shown in detail in defendant’s exhibit 9-A, which is made a part hereof by reference.
37. The narrow family of airfoils covered by the claims of the second patent is also covered by the claims of the first patent with the exception of claim 13, when a value of B is selected equal to —A. The second patent therefore extends the monopoly already covered by claims of the first patent for a period of more than 17 years, and the second Davis patent is void because of double patenting.
*545 MANUFACTURE AND DISPOSITION OF AIRPLANES IN SUIT
38.Defendant caused to be manufactured under the provisions of the contract in suit airplanes employing wings embodying the alleged inventions of the patents here in suit, as follows:

Government contractor Number Type

Douglas Aircraft Corporation_ 944 B-24 airplanes.
North American Aviation, Inc_ 966 B-24 airplanes.
Ford Motor Company- 6,672 B-24 airplanes.
Consolidated Yultee Aircraft Corp- 7, 696 B-24 airplanes.
213 0-87 airplanes.
5 AT-22 airplanes.
30 RY-1 and RY-3 airplanes.
118 B-32 airplanes.
739 PB4Y-2 airplanes.
The total number of airplanes so manufactured was 17,383.
39. The plaintiff has received payment of $5 royalty for each of the 17,383 airplanes referred to in the preceding finding, as required by the contract in suit, totaling $86,915.
40. Pursuant to a motion for call on the Department of the Air Force for a statement showing the ultimate disposition of the 17,383 airplanes defendant had manufactured under the contract in suit, that department filed a partial response on February 2, 1950, and a final response on February 27, 1950. These two responses are in evidence as plaintiff’s exhibits 2 and 3, respectively.
In response to a motion for call, allowed by the Court, the Department of the Navy on January 15, 1951, reported the disposition and use of aircraft manufactured under Navy contracts.
The following table summarizes the detailed disposition of the aircraft listed in the foregoing responses:

*546

Direct deliveries were made of 168 aircraft to Australia, 64 to Canada and 1,729 to the United Kingdom. The remainder *547 were first delivered to the United States Air Forces or the Navy and thereafter diverted to the foreign country involved.
One B-24 included in direct deliveries to Australia was ultimately delivered to the Reconstruction Finance Corporation in Kingman, Arizona, in October 1945. One B-24 included in direct deliveries to the United Kingdom was returned to the United States Air Forces and condemned in June 1946. Ten of the RY-3 aircraft that had been diverted by the Navy to the United Kingdom prior to September 1945, were returned to the Navy thereafter and a similar number of this type of aircraft were salvaged by the Navy.
All of the aircraft delivered to foreign governments were transferred during World War II and within the period of the National Emergency declared by the President May 27, 1941, and prior to the proclamation of “Cessation of Hostilities” of World War II announced on December 31, 1946.
The above facts and figures were taken from plaintiff’s exhibits 2 and 3 and the response of the Navy Department filed January 15, 1951.
42. As far as could be ascertained by the services involved, all the aircraft sent to foreign governments were transferred in accordance with the provisions of the Lend-Lease Act of March 11,1941 (55 Stat. 31) designated as “An Act to Promote the Defense of the United States.”
In pursuance of this act, mutual aid pacts known as lend-lease agreements were entered into between the United States and the United Kingdom February 23,1942 (56 Stat. 1433-1435) ; with the Republic of China on June 2,1942 (56 Stat. 1494-1496) and with Yugoslavia on July 24,1942 (56 Stat. 1570-1572). Australia accepted the principles of these agreements by an exchange of letters in Washington, D. C., September 3,1942 (56 Stat. 1608).
The agreement with the United Kingdom, referred to above, contained the following provisions:
The Government of the United Kingdom will not without the consent of the President of the United States of America transfer title to, or possession of, any defense article or defense information transferred to it under the Act or permit the use thereof by anyone not an of *548 ficer, employee, or agent of tbe Government of tbe United Kingdom.
* * * ^ *
Tbe Government of tbe United Kingdom will return to tbe United States of America at tbe end of tbe present emergency, as determined by tbe President, sucb defense articles transferred under this Agreement as shall not have been destroyed, lost or consumed and as shall be determined by tbe President to be useful in tbe defense of the United States of America or of the Western Hemisphere or to be otherwise of use to the United States of America.
Tbe agreements with China and Yugoslavia contained similar provisions.
43. A response to a call upon tbe Secretary of State (plaintiff’s exhibit 6) stated in part as follows with respect to tbe 64 B-24 airplanes that were procured by Canada from the United States:
As to Canada, during the war, materials and services including the 64 B-24 planes here in suit, were procured by Canada from the United States through lend-lease requisitioning channels under the authority of the Lend-Lease Act, for which Canada deposited cash with the United States Treasury in advance of procurement.
Even with respect to lend-lease articles for which the recipient government paid in advance the United States has maintained the position that it retained certain rights and interests. These rights include the right to recapture upon demand and to have the recipient country obtain the consent of the United States prior to turning the articles over to any other country. The fact that the recipient country paid for the articles did not mean that title to those articles passed, just as it did not pass with respect to transferred lend-lease articles for which the only obligation was to make some settlement at a future date. As to all these articles the United States Government has maintained the position that in the absence of a special agreement title did not pass.
By letter mailed and delivered in Washington, D. C., dated December 6, 1945, Thomas B. McCabe, Foreign Liquidation Commissioner, informed J. B. Mooney, Associate Director General, Department of Munitions and Supply of the Dominion of Canada, in Washington, that the United States Government relinquished any right, title or interest that it may have had in any property *549 transferred to Canada under the lend-lease mechanism and paid for by Canada, including the right to recapture any such property and the right to refuse consent to the retransfer of any such property.
44. Prior to the commencement of negotiations for settlements for lend-lease aid, the recipient countries were asked to submit inventories of materials of lend-lease origin remaining in their possession as of VJ-day, September 2,1945. The inventories submitted in accordance with this request are the last and only available inventories in the possession of the State Department. Of these inventories, only the United Kingdom and Australia list any of the aircraft involved herein. A response to a call on the State Department lists these inventories as follows (plaintiff’s exhibit 6):

Of the 892 serviceable B-24s the United Kingdom reported that 800 were under conversion from combat to military transports.
45. The Lend-Lease Settlement Agreement with the United Kingdom was first set forth in general terms in a joint statement executed December 6,1945 (60 Stat. 1564). This was followed by a specific implementing agreement, executed March 27,1946 (60 Stat. 1525).
Under section IV of this agreement relating to military holdings, paragraph 2 reserved to the Government of the United States its right of recapture of any lend-lease articles held by the United Kingdom Armed Forces, but indicated that it was not intended that this right of recapture would be exercised generally.
Under section V of this agreement relating to lend-lease noncombat aircraft, paragraph 4 provided for the transfer to the United Kingdom as of September 2,1945, full title to 18 Liberator (C-87) transport aircraft, subject only to the condition that when they became surplus to the British mili *550 tary requirements they would not be transferred by sale, loan or otherwise, to third countries without the consent and agreement of the Government of the United States.
This agreement also provided that the United Kingdom might continue to use for military purposes such Liberator aircraft (B-24s) as had been converted by the Royal Air Force into improvised transport aircraft, but that no such converted aircraft would be employed by the Government of the United Kingdom for commercial hire in the carriage of freight or passengers.
46. A mutual aid settlement agreement was executed by the United States and Australia June 7,1946 (60 Stat. 1707). This agreement provided that the Commonwealth of Australia should be deemed to have acquired full title to all lend-lease articles in its possession as of September 2, 1945, other than lend-lease articles in the possession of the armed forces on that date. The Government of the United States, with respect to lend-lease articles, and the Commonwealth of Australia, with respect to reciprocal aid articles, reserved a right to recapture at any time after September 1, 1945, any such articles which, as of the date upon which notice was communicated to the other government, were in the armed forces of the other government, although neither government intended to exercise generally this right of recapture.
A mutual aid settlement agreement was executed by the United States and Yugoslavia July 19, 1948 (62 Stat. 2133). This agreement also reserved to the United States the right to recapture any lend-lease articles of types defined as implements of war, which were held by the Government of Yugoslavia on the date notice of recapture was communicated to it. In the agreement the United States indicated that it did not intend to exercise generally its right to recapture such articles, other than vessels made available to Yugoslavia under lend-lease, which would be returned to the United States. The Government of Yugoslavia agreed not to transfer or dispose of such articles to any third country or for export without the prior consent of the Government of the United States.
*551 47.The status of the 1,821 aircraft inventory reported by the United Kingdom as of September 2, 1945, was estimated as of September 30,1946, as follows:

It does not appear that the Government of the United States exercised its right of recapture of any of the aircraft remaining in the possession of foreign governments after the termination of hostilities.
No lend-lease settlement agreement has been consummated with the Republic of China as to the airplanes in suit.
48.Plaintiff’s exhibit 4, which is a response to a call on the Secretary of the Navy requesting a summary of disposal of certain types of aircraft procured on United States Army Air Forces contracts and which were turned over to the United States, shows the following summary:

DISPOSITION OF AIRCRAFT INVOLVED HEREIN BY SURPLUS PROPERTY AGENCIES
49.Pursuant to Executive Order 9425 dated February 19, 1944, and Surplus War Property Administration Regulation 1, dated May 8,1944, the Reconstruction Finance Corporation was designated the disposal agency for certain surplus war property, including aircraft.
*552 The Defense Plant Corporation was created by the Reconstruction Finance Corporation August 22, 1940, and it was dissolved July 1, 1945. The RFC delegated the Defense Plant Corporation as disposal agency for surplus property and it functioned in this category from May 15, 1944, until May 15, 1945, when the RFC took over the functions of surplus property disposal, and continued until January 15, 1946. On the latter date the RFC created the War Assets Corporation for the purpose of handling all types of property for which the RFC was then the disposal agency.
By Executive Order 9689 dated January 31,1946, the War Assets Administration was established, effective March 25, 1946, headed by an Administrator; and thereafter all property, records, and personnel employed by the RFC in the disposal of surplus property were transferred to the War Assets Administration.
Aircraft involved herein that had been transferred to the Defense Plant Corporation, Reconstruction Finance Corporation, or War Assets Corporation are summarized from the tabulation in finding 40 and finding 48, as follows:

50. The surplus property disposal records of the War Assets Administration were turned over to the General Services Administration. On August 4, 1950, this Court allowed a motion for call addressed to the General Services Administration. This motion for call had attached thereto a letter from the War Assets Administration reading as follows:
Deo. 30,1947.
Mr. Eoward Gallagher,
Attorney at Law, Investment Building, 'Washington 5, D. G.
Dear Mr. Gallagher : This will acknowledge receipt *553 of your letter of December 21, 1947, addressed to Mr. Larson requesting information as to tbe inventory of aircraft using Davis wings.
There is listed below the quantities of aircraft of the type which you requested information on that were sold by WAA :
B-24_5, 884
B-32- 109
PB4T_ 487
C-87- 30
AT-22_ 0
RY-1_ 2
B.X-3 (Salvaged)_ 8
Most of the foregoing aircraft were sold “as is, where is” at location by so-called “on the hoof” sale with non-flight warranty on each aircraft. Therefore, it is hardly likely that many of these aircraft are in use today as only a few such nonflight warranties were ever rescinded by WAA.
For details as to exactly how many of such types are in actual operational status today in the U. S., it is suggested that you contact the Recordation and Registration Section of the Civil Aeronautics Administration, Washington 25, D. C., as that Agency would have record of any operational aircraft of the categories you mentioned if any are still in operational status.
It is believed the foregoing constitutes the information you desire. However, should you desire additional information it is possible we may be able to help you.
Very truly yours,
(S) Cecil G. Coppage, for Thomas A. WaddeN,
Director, Aircraft Division, Office of Aircraft and Electronics Disposal.
The motion for call requested the General Services Administration to furnish for the Court records the names of the parties who purchased the aircraft listed in this letter. The General Services Administration, in response to such call, submitted a tabulation of sales of aircraft embodying the Davis airfoil wing as determined from the records of that office and bearing a date of manufacture subsequent to April 1, 1’943, which response is in evidence as plaintiff’s exhibit 8. Such sales were made pursuant to the Surplus Property Act of 1944, as amended, by competitive bids in which the *554 purchasers were to reduce the metallic content of these aircraft to scrap, but accessories and instruments could be salvaged and resold separately. The sales contracts provided for salvage and scrap purposes only, flight use being prohibited.
The classification of aircraft sold by the Reconstruction Finance Corporation or the War Assets Administration, and included in the response of the General Services Administration, is summarized as follows:
B-24 series (USAF)_5,726
B-32 series (USAF)_ 109
0-87 series (USAF)_ 13
BY series (Navy)- 8
PB4Y series (Navy)- 309
Total_6,165
This list includes all of the airplanes sold as salvage scrap.
51. The total of 6,165 airplanes in the above tabulation shows a difference of 284 aircraft between the number of 6,399 airplanes transferred to surplus property agencies by the United States Air Forces and the Navy (see tabulation in finding 49) and a difference of 355 airplanes between the 6,520 airplanes listed in the letter from the War Assets Administration of December 30,1947, which plaintiff used as the basis of its call.
The response to the call further stated—
The tabulation covers 6,165 of the 6,520 aircraft referred to in the attachment to plaintiff’s Motion for Call dated June 22,1950. The records of this agency are not indexed in such a manner as to permit positive identification of the purchasers of the balance of the 355 aircraft referred to in the attachment to the plaintiff’s Motion for Call dated June 22,1950.
The data furnished in response to the call that was made on the General Services Administration were prepared by a Mr. Tuttle after a complete investigation of all available records. Mr. Tuttle, at the time he made the investigation, was aware that additional sales were made on other than a scrap-salvage basis but the records of sales of additional aircraft could not be located.
*555 CONclxjsiok of LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein [No. 48775], the court concludes that as a matter of law the plaintiff is not entitled to recover, and its petition is therefore dismissed.

 Title 60 Is the basic group of patent statutes and sets forth what shall constitute a valid patent.